**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| INTERNATIONAL BROTHERHOOD OF TEAMSTERS, LOCAL 743, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 1:21-cv-03840 |
| v. | ) ) ) | The Hon. Gary S. Feinerman |
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS HEALTH AND WELFARE AND PENSION FUNDS | ) ) ) ) ) | |
| Defendant. | ) | |

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER**

Defendant Central States, Southeast and Southwest Areas Health and Welfare and Pension Funds ("Central States," the "Fund," or "Defendant"), by and through its attorneys, file this Response in Opposition to Plaintiff's Motion for Temporary Restraining Order. For the reasons set forth more fully below, the Court must deny Plaintiff's Motion.

## I. SUMMARY OF ARGUMENT

This case unquestionably involves and arises out of a labor dispute within the meaning of Section 113(c) of the Norris-LaGuardia Act ("NLGA"). 29 USC § 113. Plaintiff's pending Motion for a Temporary Restraining Order asks the Court to: a) enjoin the Fund from continuing to enforce its COVID-19 Vaccination Policy that it announced and implemented on June 28, 2021, until the parties "are able to complete the interest arbitration and two grievance arbitrations"; b) compel the Fund to submit its Vaccination Policy to binding interest arbitration though it never agreed to do so; and c) compel the Fund to skip the parties' contractually required grievance hearing and immediately submit to arbitration the two grievances Plaintiff filed on June 11, 2021, which the Union but did not request to schedule until July 21. Each request fails to qualify for the narrow

"reverse *Boys Markets*" exception to the NLGA's broad prohibitions against injunctive relief in a labor dispute.

*First*, Plaintiff cannot establish irreparable harm or that Plaintiff lacks an adequate remedy through the parties' normal grievance arbitration process, pursuant to which an arbitrator may order make-whole relief including reinstatement and back pay. Plaintiff's complained of injuries are limited to: i) employees' potential economic loss if they potentially suffer a loss of employment under the Fund's attendance policy if they refuse to comply with the vaccination mandate without an accommodation for a legally protected reason; and ii) personal objections some employees have to the available COVID-19 vaccines. As the case law discussed below makes clear, these are not nearly sufficient to satisfy what is required to demonstrate irreparable injury that would so frustrate the arbitral process so as to render it meaningless. (*See infra.*). With respect to Plaintiff's two grievances filed on June 11, 2021, which are scheduled for a grievance hearing on July 28 (Declaration of Scott Robbins ("Robbins Dec.") at ¶31), an arbitrator could potentially render a decision that provides complete make-whole relief to affected employees.[1]

Second, Plaintiff cannot establish that the Fund has ever agreed or is contractually bound to submit its health and safety Vaccination Policy to interest arbitration under the maintenance of standards language in Section 5.2(b) of the Hourly CBA. The interest arbitration language in 5.2(b) is limited in scope to implementation of a "new plan of an economic nature covering wages or other benefits." As Arbitrator Fletcher held when interpreting what constitutes a "new plan of an economic nature" within the meaning of Section 5.2, it is when management changes jobs "in such

---

[1] Contrary to the representations in Plaintiff's court filings, the Fund has never refused to meet or to arbitrate the two contractual grievances Plaintiff filed on June 11, 2021. Rather, the grievances were never moved to a grievance hearing because Plaintiff never requested to meet to move its grievances forward. Under Section 13 of the Hourly CBA and Section 12 of the Salary CBA, a grievance hearing and written answer to the grievance are prerequisites to the Union moving a grievance to third-party arbitration.

a way as to make the incentive pay system produce less earnings with the same amount of effort." (*See* Ex. 1.2, Arbitrator Fletcher award). Hourly employees have not worked under a pay incentive system in ten years. The language has never been applied outside this limited context. The Fund's Vaccination Policy clearly arises under the health and safety sections of the Hourly and Salary CBAs (Sections 16 and 15, respectively), which provide simply that the Fund "shall make reasonable provisions for the safety of its employees in its office during the hours of their employment." As such, Plaintiff's argument that the Fund is contractually obligated to submit its Vaccination Policy to interest arbitration is frivolous, and cannot be a basis for finding an exception to the broad prohibitions against injunctive relief in labor disputes under the Norris LaGuardia Act.

## II.  FACTUAL BACKGROUND

In March 2020, due to the Covid-19 pandemic, Executive Director of the Fund, Thomas Nyhan, decided to transition the Fund's workforce to a work from home operation to protect the health and safety of its employees, their families, and the community. (Ex. 3, Declaration of Thomas Nyhan, at ¶¶3-4).

In spring of 2021, following the development and widespread availability of the COVID-19 vaccine, as well as guidance promulgated by the CDC and the Illinois Department of Health, and considering the considerable benefits that an in-person work environment provides, including improved communication, training, knowledge transfer and morale, Nyhan decided to begin transitioning the Fund's employees back into the office, beginning on September 7, 2021. (Ex. 3 at ¶5, 7-8). To ensure a safe transition back to an in-office work environment, Nyhan decided that all employees would have to be fully vaccinated against COVID-19 by the time they returned to the office at the beginning of September 2021, with exceptions for those with approve medical or religious accommodations. (Ex. 3 at ¶8).

In order to give all returning employees, including members of Local 743, time to comply with the directive, Nyhan announced the Fund's intentions and proposed Vaccination Policy at a Local 743 committee meeting on May 26, 2021. (Ex. 3 at ¶9). Following the meeting, the Union requested to engage in effects bargaining over the proposed Vaccination Policy and the Fund's management committee met with the Union representation on June 1, 3, and 8, 2021, before the Union elected to cease discussions on June 10, 2021. (Ex. 3 at ¶10; Ex. 2, Declaration of Charles Lee, at ¶6-7). At no point during the May and June meetings did the Union contend that the adoption of the Fund's Vaccination Policy violated any provision of the CBAs, nor did the Union claim the Policy constituted a "new plan of an economic nature," or raise the possibility of interest arbitration. (*Id.*). Instead, the Union argued the proposed Vaccination Policy was either unlawful or unreasonable because the COVID-19 vaccines had only received Emergency Use Authorization (EUA) from the FDA, and the proposed Policy was "unfair" to those who did not want to be vaccinated. (*Id.*)

On June 14, 2021, Lee contacted Local 743 to advise that the Fund had provided the Union with two revised Policy proposals, but had not received any counter revisions from the Union. (Ex. 2 at ¶11). Lee also informed Local 743 that the Fund intended to implement the Policy on June 28, 2021, but remained willing to discuss any aspect of the Policy prior to implementation. (*Id.*). Lee did not receive any response from the Union. (*Id.*). On June 21, 2021, Lee again contacted Local 743 to discuss the Fund's proposed revisions and to inform them that if he did not hear from the Union by June 25, 2021, that the Fund would commence implementation of the Vaccination Policy on June 28, 2021, as planned. (*Id.*). Again, the Union did not respond to Lee's email. (*Id.*)

On June 28, 2021, the Fund announced the implementation of the COVID-19 Vaccination Policy, and informed all employees that beginning September 7, 2021, staff would be required to start transition back to working in the office. (Ex. 3 at ¶¶11-12). 24. The Policy requires that as a

condition to returning to the office, all employees must be fully vaccinated against COVID-19, unless approved for an accommodation on religious or medical grounds. (Ex. 1 at ¶ 24). The Policy also offers employees additional paid time off (PTO) at Section 3.0 to compensate for time getting vaccinated. (*Id.*). Employees who choose not to get vaccinated and have not been approved for a religious or medical accommodation, may be subject to discipline for unexcused absences from work under the Fund's existing attendance policy. (*Id.*). To avoid incurring an unexcused absence, employees may choose (at the employee's option) to use their available PTO days. (*Id.*). However, once PTO is exhausted, the employee would again incur unexcused absences and may be subject to termination after exceeding the amount of unexcused absences permitted under the attendance policy. (*Id.*). However, employees who have commenced the vaccination process at any time will thereafter not be assessed unexcused absences while they are waiting to become fully vaccinated. (Ex. 3 at ¶16).

Based on recent employee reported data, the Hourly Unit is currently at an 84.7% vaccination rate, while the Salary Unit is at a 95.6% vaccination rate. (Ex. 1 at ¶39). To date, less than 10% of the Fund's unionized workforce refuses to get the vaccine and have not submitted a request for an accommodation. (Ex. 3 at ¶20).

On June 29, 2021, Local 743's legal counsel, Joel D'Alba contacted Lee requesting an "expedited" arbitration of two grievances that the Union had filed purportedly challenging the Vaccination Policy. (Ex. 2 at ¶15). Lee later confirmed that D'Alba was referring to two grievances filed by Local 743 on behalf of Hourly and Salary bargaining employees on June 11, 2021. (Ex. 2 at ¶16). However, neither grievance expressly referenced the Fund's Vaccination Policy. (*Id.*). Moreover, neither the Hourly nor the Salary CBA provides a mechanism for an "expedited" arbitration. (Ex. 2 at ¶19).

### III. <u>PROPER STANDARD FOR INJUNCTIONS IN AID OF ARBITRATION</u>

### A. The Norris-LaGuardia Act.

The Norris-LaGuardia Act (the "NLGA") (29 USC § 101 *et seq.*) broadly removes from federal courts the *jurisdiction* to order temporary and permanent injunctive relief in controversies involving or arising out of labor disputes, such as the one before the Court. Section 101 of the NLGA states:

> No court of the United States, as defined in this chapter, shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this chapter; nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this chapter.

29 USC §101.

Section 7 of the NLGA sets forth strict requirements that a district court must comply with in order to have jurisdiction to issue temporary or permanent injunctive relief in a case involving or arising out of a labor dispute. Specifically, Section 7 provides in relevant part that:

> No court of the United States shall have jurisdiction to issue a temporary or permanent injunction in any case involving or growing out of a labor dispute, as defined in this chapter, except after hearing the testimony of witnesses in open court (with opportunity for cross-examination) in support of the allegations of a complaint made under oath, and testimony in opposition thereto, if offered, and except after findings of fact by the court, to the effect—
>
> \* \* \*
>
> (b) That substantial and irreparable injury to complainant's property will follow;
>
> \* \* \*
>
> (d) That complainant has no adequate remedy at law; and
>
> \* \* \*
>
> Such hearing shall be held after due and personal notice thereof has been given, in such manner as the court shall direct, to all known persons against whom relief is sought, and also to the chief of those public officials of the county and city within which the unlawful acts have been threatened or

Page **6** of **17**

committed charged with the duty to protect complainant's property: *Provided, however*, That if a complainant shall also allege that, unless a temporary restraining order shall be issued without notice, a substantial and irreparable injury to complainant's property will be unavoidable, such a temporary restraining order may be issued upon testimony under oath, sufficient, if sustained, to justify the court in issuing a temporary injunction upon a hearing after notice. Such a temporary restraining order shall be effective for no longer than five days and shall become void at the expiration of said five days. No temporary restraining order or temporary injunction shall be issued except on condition that complainant shall first file an undertaking with adequate security in an amount to be fixed by the court sufficient to recompense those enjoined for any loss, expense, or damage caused by the improvident or erroneous issuance of such order or injunction, including all reasonable costs (together with a reasonable attorney's fee) and expense of defense against the order or against the granting of any injunctive relief sought in the same proceeding and subsequently denied by the court.

29 USC § 7.

Section 108 of the NLGA further provides that "[n]o restraining order or injunctive relief shall be granted to any complainant who has failed … to make every reasonable effort to settle such dispute either by negotiation or with the aid of any available governmental machinery of mediation or voluntary arbitration. 29 USC § 108.

### B. The Narrow Exception to the NLGA for "Reverse *Boys Markets*" Injunctions.

Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, provides a federal cause of action for the alleged breach of a collective bargaining agreement, "encourag[ing] arbitration and afford[ing] the party to a collective bargaining contract the benefit of its bargain." See discussion in *Niagara Hooker Emps. Union v. Occidental Chem. Corp.*, 935 F.2d 1370, 1375-76 (2d Cir. 1991). Noting a potential conflict between the LMRA and the NLGA, the Supreme Court reconciled the statutes in *Boys Markets, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235, 253-54 (1970), by recognizing a narrow exception to the NLGA whereby, in certain circumstances, enjoining a strike by a union was permissible if "the collective bargaining

agreement between the parties contained a no-strike clause and if the strike involved a grievance that the parties had agreed to submit to arbitration." *Local Lodge No. 1266, International Assoc. of Machinists and Aerospace Workers, AFL-CIO v. Panoramic Corp.*, 668 F.2d 276, 279 (7th Cir. 1981). The reasoning being that "injunctive relief in such circumstances was essential to enforcement of the parties' agreement to arbitrate contract disputes." *Panoramic Corp.*, 668 F.2d at 279. However, the Supreme Court in *Boys Markets* cautioned too that a district court "may issue no injunctive order until it first holds that the contract does have th[e] effect" of binding both parties to arbitrate the grievance. *Id.* (quoting *Boys Markets, Inc*. 398 U.S. at 254).

The scope of the "reverse *Boys Markets*" exception to the NLGA was narrowed by the Supreme Court in *Buffalo Forge Co. v. United Steelworkers*, 428 U.S. 397 (1976). There the employer sought to enjoin the union from engaging in a sympathy strike the employer claimed was in violation of the parties' contractual no-strike clause. The Supreme Court held that under those circumstances an injunction was improper because the dispute was not "even remotely subject to arbitration provisions in the contract." *Buffalo Forge Co.*, 428 U.S. at 407.

In applying rationale of the Supreme Court's holdings in *Boys Markets, Inc.* and *Buffalo Forge Co.* to requests from unions for "reverse *Boys Markets*" injunctions against employers, the Seventh Circuit in *Panoramic Corp.* adopted the Fourth Circuit's "frustration of arbitration" analysis in *Lever Brothers Co. v. Intl. Chem. Workers Local 217*, 554 F.2d 115 (4th Cir. 1976). Under this approach, the Seventh Circuit said that injunctions in aid of arbitration against employer breaches of collective bargaining agreements are permissible as an exception to the NLGA "where the underlying dispute is subject to mandatory arbitration under the labor contract and where the injunction is necessary to prevent arbitration from being rendered a meaningless ritual." *Panoramic Corp.,* 668 F.2d at 283. Of course, "the court must be satisfied that traditional

requirements of equity – irreparable injury, a balance of hardships, and, to an appropriate degree, probability of success on the merits – support the award of injunctive relief." *Id*.

In *Panoramic Corp.*, the issue of arbitrability of a "successors" clause in the CBA was not disputed. The court also found the grievance dispute over whether Panoramic's proposed sale of a division of its business violated the "successors" clause in the CBA "raise[d] a sufficiently 'genuine' dispute to support a status quo injunction." *Id*. at 285. The court focused its analysis on the question of irreparable injury, where the inquiry was "quite properly confined to the question of whether Panoramic's action would frustrate the arbitral process and whether the equitable principles of irreparable injury and balance of hardships supported an award of relief." *Id*. at 285.

The *Panoramic* court concluded that injunctive relief was warranted in that case because if Panoramic was permitted to proceed with the sale of the division of its business, a later arbitration would not be able to effectively reverse the commercial sale of the business to another party. *Id*. at 286. In support the court cited numerous decisions similarly holding in the context of a partial liquidation of a business, relocation of a plant, termination of a business, sale of a business, and relocation of corporate headquarters. *Id*. The court also rejected Panoramic's argument that an arbitrator could effectively later order the buyer of the business to reinstate / hire the affected Panoramic employees whose employment was separated as part of the sale. *Id*. at 286-287. Specifically, the court observed "[w]e are much less confident than Panoramic that an arbitrator possesses the authority to order rescission of such a contract of sale after it has been consummated," and "[e]ven if such authority existed, an arbitrator would likely be extremely reluctant to enter a rescission order given the practical difficulties of implementing it." *Id*. at 287.

In contrast to the circumstances involved in *Panoramic Corp.*, where there are not such complicating factors like a change in ownership or relocation of a business, arbitrators are perfectly capable of ordering reinstatement of employees with back pay and other make-whole relief as

warranted. Courts have repeatedly held that separation of employment does not constitute irreparable harm so as to satisfy the narrow exception to the NLGA for a "reverse *Boys Markets*" status quo injunction. *See Sampson v. Murry*, 415 U.S. 62, 91-92 (1974) (holding that an employee's dismissal pending administrative appeal did not constitute irreparable harm); *Graham v. Med. Mut. Of Ohio*, 130 F.3d 293, 296 (7th Cir. 1997) (holding an injury is irreparable for the purposes of granting preliminary injunctive relief only if it cannot be remedied through a monetary award after trial); *East St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 705, 707-708 (7th Cir. 2005) (explaining that a permanent loss of employment does not equate to irreparable harm under traditional equity principles or NLGA §7).

While not at issue in *Panoramic Corp.*, courts have also denied requests for injunctive relief where the union's argument about the contractual requirement for the employer to arbitrate a dispute is unsupported. In *Gen. Drivers & Dairy Emps., Local No. 563 v. Bake Rite Baking Co.*, 580 F. Supp. 426 (E.D. Wis. 1984), the union sought a reverse *Boys Markets* injunction arguing the employer's plan to liquidate part of its business was subject to contractual grievance arbitration under Articles 4 and 7 in the CBA that dealt with efforts to sell or transfer the business as an ongoing operation. 580 F.Supp. at 431-32. The court found the union "failed to establish that their position at arbitration [wa]s sufficiently sound that an injunction should issue." *Bake Rite Baking Co.*, 580 F.Supp. at 431. In so finding, the court explained:

> I refer to Articles 4 and 7 of the collective bargaining agreement. Both provisions speak to those situations where the operation, or a part thereof, is transferred and continues under the control of a new entity. There is no express reference to liquidation, and the contractual language does not suggest that the parties intended that Bake Rite's obligations under Articles 4 and 7 would become operative in the event of liquidation. Therefore, if this matter were to proceed to arbitration, any argument that Bake Rite has failed to abide by Articles 4 and 7 would be groundless. Those articles simply do not reach situations such as the one at bar.

*Id*. at 431-32.

## IV.     ARGUMENT

### A.     Plaintiff Cannot Establish Irreparable Harm Necessary to Qualify for the "Reverse *Boys Market*" Exception to the NLGA Prohibition on Injunctive Relief in Labor Disputes.

Plaintiff cannot satisfy the criteria for a "reverse *Boys Markets*" injunction because Plaintiff cannot show it will suffer irreparable harm without injunctive relief. Here, the parties' available remedies through the parties' normal contractual grievance procedure provides an adequate remedy. Like the numerous cases cited above, courts regularly find no irreparable injury in circumstances such as those presented here, where there is no change in ownership or operation of the business, and there is no reason to doubt the ability of an arbitrator to effectively order reinstatement and other make-whole relief. *See East St. Louis Laborers Local 100*, 414 F.3d at 705 (clarifying that the 7th Circuit's conclusion in *Panoramic* that the union would suffer irreparable harm "was driven in large part by the practical impossibility of fashioning a damage remedy *under those circumstances*," and does not imply that permanent loss of employment is, in itself, an irreparable harm); *Local Union 15, Intern Broth. of Elec. Workers, AFL-CIO v. Exelon Corp.*, 191 F.Supp.2d 987, 992 (N.D. Ill. 2001) (explaining the determination of irreparable harm is a conclusion of law not fact and that the union's allegations of job loss, loss of benefits, and an undermining of the union are insufficient to establish irreparable harm required to grant a preliminary injunction pending arbitration); *Aluminum Workers Intern. Union, AFL-CIO, Local Union No. 215 v. Consolidated Aluminum Corp.*, 696 F.2d 437, 443 (6th Cir. 1982) (holding the loss of employment for sixteen persons, even if occasioned by employer actions subject to arbitration, was not irreparable harm sufficient to support injunctive relief under the NLGA where there was no evidence to suggest that defendant would be unable to fully comply with an order for back pay or reinstatement); *United Steel, Paper & Forestry, Rubber Manufacturing, Energy, Allied Industrial & Service Workers International Union, AFL-CIO-CLC v. Essentia Health*, 280

F.Supp.3d 1161, 1165 – 1167 (D. Minn. 2017) (finding an alleged "violation of [union] members' bodily autonomy" posed by a mandatory flu vaccine, subject to religious and medical exceptions, did not justify an exception to the NLGA). Here, the available remedy through the normal grievance and arbitration process is perfectly capable of providing Plaintiff an effective remedy.

> **B. Plaintiff's Argument that the Fund Is Contractually Obligated to Submit Its Vaccination Policy to Interest Arbitration Under 5.2(b) Is Unsupported, and So Fails to Qualify for the "Reverse *Boys Market*" Exception to the NLGA.**

The Vaccination Policy is plainly outside the narrow scope of the interest arbitration provision in Section 5.2(b) of the Hourly CBA, which is limited to disputes over the impact of a "new plan of an economic nature covering wages or other benefits." This language was previously arbitrated by the parties and held to refer to the adoption or implementation of new equipment or technology that change the job duties of employees "in such a way as to make the incentive pay system produce less earnings with the same amount of work." (Ex. 1 at ¶7; Ex. 1.2 at 24-25). The history of the language in Section 5.2 deals with Hourly Unit employees whose hourly pay rates used to be determined using an incentive pay system, such that changes in job duties, technology, equipment or processes can reduce the employees' productivity and result in a reduction in their hourly wage rate. (Ex. 1 at ¶11).

As such, the scope of the interest mediation provision in Section 5.2(b) is quite narrow – indeed the Fund has not had any employees work on an hourly pay incentive system in years. Since the interest arbitration language was negotiated into the contract in the 2000 bargain, it has never been invoked by the Union. Nor did the Union assert that it applied during the parties' effects bargaining over the Vaccination Policy in May and June. (Ex. 1 at ¶13).

The general provisions providing for the mandatory arbitration of grievances are found in Section 13 of the Hourly CBA and Section 12 of the Salary CBA. (See Exhibits A and B to the Verified Complaint.) Neither section provides for interest arbitration. Like the court found in *Bake*

*Rite Baking*, the Union's argument that the Fund previously agreed and is contractually bound by Section 5.2(b) to submit a Vaccination Policy to interest arbitration is groundless. There is no reference in Section 5.2(b) to the interest arbitration provision applying to health and safety polices (Section 16), or any other section of the Hourly CBA. The Vaccination Policy in no way impacts the productivity or wage rates of Hourly employees. (Ex. 1 at ¶14).

In the 2000 negotiation, the quid pro quo for adding the maintenance of standards interest arbitration language to Section 5.2 was removal of the prior contract language in Section 5.2 that prohibited the Fund from implementing such changes "without first negotiating and securing the permission of the Union." (Ex. 1.1). Like the court found in *Bake Rite Baking*, the Union's argument here that the Fund previously agreed and is contractually bound by Section 5.2(b) to submit the Vaccination Policy to interest arbitration before implementing is groundless. There is no reference in Section 5.2(b) to the interest arbitration provision applying to health and safety polices (Section 16) or to any other sections of the Hourly CBA. Moreover, the Vaccination Policy in no way impacts the productivity of Hourly Unit employees in such a way that adversely affects their incentive based hourly earnings for the same effort. (Ex. 1 at ¶14).

Even if Section 5.2(b) were applicable in this case – and it is not – the parties' deletion of the old language expressly requiring the Fund to get the permission of the Union before implementing a mid-contract change involving a "new plan of an economic nature" supports the interpretation that the Union has waived any purported right to injunctive relief to rescind policy implementation without the Union's consent. When considered also in the context of the deferential language of the health and safety provisions in Section 16.1 of the Hourly CBA and 15.1 in the Salary CBA, which state simply that the Fund "shall make reasonable provisions for the safety of its employees in its office during the hours of their employment," it is apparent that the Fund has flexibility under these provisions, as well as the management rights' provisions

(Section 6.1 in the Hourly and Salary CBAs) to adopt reasonable health and safety policies to protect employees' health. That is precisely what the Fund did in this case. (Ex. 3 at ¶18); *See also, Klaasen, et al. v. The Trustees of Indiana University*, No. 1:210cv099238-DRL-SLC, 2021 WL 3073926, at *42-43 (N.D. Ind. July 18, 2021) (denying motion to enjoin university from implementing a mandatory COVID-19 vaccine policy where the public interest outweighed the balance of harms against the plaintiffs); *Bridges v. Houston Methodist Hospital, et al.*, No. H-21-1774, 2021 WL 2399994 (S.D. Tex. June 12, 2021) (denying injunction to block a mandatory COVID-19 vaccination requirement for employees and stataing "being forced to be injected with a vaccine or be fired…is not coercion," because employees can "freely choose to accept or refuse a COVID-19 vaccine").

Indeed, during the parties' effects bargaining meetings on May 29 and June 1, 3, and 8, 2021, the Union acknowledged at the table that the Fund had the discretion to unilaterally adopt reasonable health and safety policies, like the Vaccination Policy. (Ex. 1 at ¶18; Ex. 2 at ¶8; Ex. 3 at ¶10). The Union pushed back not on the right of the Fund to adopt a policy but on the vaccines having only Experimental Use Authorization from the FDA. (Ex. 2 at ¶8, Ex. 3 at ¶10).

      **C.**     **Plaintiff's Request for an Order Compelling "Expedited" Arbitration of Its Two Contractual Grievances Is Improper and Unnecessary.**

For reasons discussed above, Plaintiff's request for injunctive relief in this labor dispute must fail under either the prohibitions of the Norris LaGuardia Act or ordinary equitable principles in a reverse *Boys Markets* analysis because Plaintiff cannot show irreparable. Also discussed above is the adequacy of Plaintiff's available remedy at law, which goes hand in hand with the lack of irreparable harm problem for Plaintiff's request for injunctive relief. A third reason Plaintiff's request for "expedited" arbitration of the grievances is inappropriate is that injunctive relief is completely unnecessary and would require the parties to skip their agreed upon grievance process.

The Fund has never refused to timely process the two June 11, 2021 grievances that Plaintiff now seeks to "expedite." In fact, on July 21 (after the parties' hearing before this Court), Plaintiff for the first time requested to meet on the grievances. (Ex. 1 at ¶14, Ex. 1.6). This was after the Fund's Deputy General Counsel Charles Lee instructed Plaintiff's counsel in a letter dated July 6, 2021, that the Union should contact Rathna Rodgers in the Fund's HR Department to schedule a grievance hearing. (Ex. 2.4).

When the Union finally contacted Ms. Rodgers on July 21, 2021, to schedule a grievance hearing, the Fund promptly scheduled the hearing for July 28 at 10:00 a.m. Following the grievance hearing to discuss the Union's evidence and arguments on the alleged violations of the Hourly and Salary CBAs, the Fund will timely provide the Union with its final written answer. This is the parties' normal process. If the Union wanted it to move faster, they could have done so.

Plaintiff has not explained why they are entitled to an order compelling the Fund to skip the parties' agreed upon steps in the grievance process, so that the parties can be pushed to third party arbitration without meeting on the same – solely because the Union waited six weeks after filing the grievances before asking for a meeting. The parties obviously believe there is value in holding grievance hearings since they put the process into their CBAs. Now the Union wants the Court to grant order the Fund to skip the parties' grievance hearings and go straight to third-party arbitration. That is the opposite of promoting collective bargaining by the parties.

## V. CONCLUSION

For the foregoing reasons, the Court must deny Plaintiff's Motion for Temporary Restraining Order in its entirety.

Dated: July 23, 2021                                        Respectfully submitted,

                                                                /s/ *Michael S. Ferrell*

                                                                Michael S. Ferrell

        Brenna R. McLean
        EPSTEIN BECKER & GREEN P.C.
        227 W. Monroe, Ste. 3250
        Chicago, IL 60606
        Tel: (312) 499-1400
        MFerrell@ebglaw.com
        BRMcLean@ebglaw.com

        Attorneys for Defendant

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that on July 23, 2021, a copy of the foregoing **Defendant's Response in Opposition to Plaintiffs' Motion for a Temporary Restraining Order** was filed with the Court using the CM/ECF system, effectuating electronic service on all counsel of record.

/s/ *Michael S. Ferrell*
Attorney for Defendant