UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| INTERNATIONAL BROTHERHOOD OF TEAMSTERS, LOCAL 743, | ) ) ) | 21 C 3840 |
| Plaintiff, | ) ) | |
| | ) | Judge Gary Feinerman |
| vs. | ) ) | |
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS HEALTH AND WELFARE AND PENSION FUNDS, | ) ) ) ) | |
| Defendant. | ) ) | |

### MEMORANDUM OPINION AND ORDER

International Brotherhood of Teamsters, Local 743, filed this lawsuit against Central States, Southeast and Southwest Areas Health and Welfare and Pension Funds, which employs the Local's members. Doc. 1. The Local alleges that the Fund's newly adopted employee vaccination policy violates the parties' collective bargaining agreements ("CBA"), and it seeks the court's assistance in expediting and ensuring arbitration of the parties' disputes regarding the policy. *Ibid*. The Local has submitted grievances on behalf of the Fund's hourly and salaried employees, and the arbitration process has commenced under the grievance arbitration provisions of both the Hourly CBA and the Salaried CBA. Doc. 25 at 2; Doc. 29 at 7-8.

Earlier in the case, the court denied the Local's motion for a temporary restraining order to require the Fund to accelerate the grievance arbitration process, to compel the Fund to submit the vaccination policy to a second kind of arbitration—interest arbitration—under the Hourly CBA, and to enjoin the Fund from implementing the policy pending arbitration. Doc. 21. Before the court is the Local's motion to compel the Fund to submit the policy to interest

1

arbitration under the Hourly CBA's interest arbitration provision. Doc. 23. The motion is denied.

## Background

On a motion to compel arbitration, "the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in [their] favor." *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 735 (7th Cir. 2002) (internal quotation marks omitted). That said, there are no disputed facts pertinent to the Local's motion to compel arbitration.

### A. The Vaccination Policy

The Local represents one bargaining unit comprised of the Fund's hourly employees, whose employment is governed by the Hourly CBA, and another bargaining unit comprised of the Fund's salaried employees, whose employment is governed by the Salaried CBA. Doc. 1 at ¶¶ 6-7; Doc. 1-2 at 1-42, 43-70. Since March 2020, due to the COVID-19 pandemic, most of the Fund's employees have been working remotely. Doc. 29 at 5; Doc. 33 at 6.

On May 26, 2021, the Fund informed the Local that it intended to begin transitioning employees back to the office sometime after Labor Day, and it presented to the Local a proposed policy regarding employee vaccinations. Doc. 29 at 6; Doc. 12-13 at ¶¶ 9, 12. Representatives from the Fund and the Local met several times to discuss the Local's objections to the proposed policy. Doc. 29-1 at ¶ 10. The objections were not resolved, and on June 11, the Local filed two grievances, one on behalf of hourly employees and the other on behalf of salaried employees. Doc. 29 at 7; Doc. 1-2 at 75-76. Some two weeks later, on June 28, the Fund announced the policy to its employees and informed them that they would be required to start working in the office beginning in September 2021. Doc. 29 at 6. The Fund later delayed the in-office start date to November 1, 2021. Doc. 29-1 at ¶ 30.

The policy requires all employees to be fully vaccinated in order to work in the office, excepting those approved for a religious or medical accommodation. Doc. 29 at 6-7. The policy awards a half day of paid time off ("PTO") for each vaccination shot, and a full day of PTO for completing a full course of vaccination. Doc. 1-2 at 77. Unvaccinated employees not approved for an accommodation will incur unexcused absences for each day the employee cannot work in the office due to her unvaccinated status. *Id*. at 78 ("Discipline will be applied in the same manner as for normal attendance issues."). To avoid incurring unexcused absences, employees can choose to use their accrued PTO days. *Ibid*. When an unvaccinated employee's PTO bank is exhausted, she will start incurring unexcused absences, and if enough unexcused absences are assessed, the employee could be terminated. Doc. 29 at 7. Once an employee receives a first dose of a vaccine, she will stop incurring unexcused absences. Doc. 1-2 at 78.

B.   **The Hourly CBA**

Two provisions of the Hourly CBA are pertinent to the Local's motion: (1) an interest arbitration provision, Section 5.2; and (2) a grievance arbitration provision, Section 13.1. (The Salaried CBA has a grievance arbitration provision but not an interest arbitration provision, which is why the Local moves to compel interest arbitration under only the Hourly CBA.)

Section 5.2 of the Hourly CBA provides for interest arbitration of "new plan[s] of an economic nature covering wages or other benefits." Section 5.2(a) reads as follows:

> 5.2(a) Advance Notice and Requirement to Bargain Changes
>
> It is agreed that if the Employer modifies, alters, adds to, withdraws or injects any new plan of an economic nature covering wages or other benefits, including but not limited to the introduction of new computer equipment or software, the Employer shall provide advance notice to the Union of its intentions, and the Employer and Union shall negotiate for a reasonable period of time to resolve the impact of said changes.

Doc. 1-2 at 9. Section 5.2(b) reads as follows:

3

>5.2(b) Interest Arbitration on Mid-Term Changes
>
>[I]f the Employer [here, the Fund] and the Union [here, the Local] cannot reach an agreement [under Section 5.2(a)], the parties shall proceed to an interest arbitration in which an arbitrator mutually selected by the Employer and the Union (pursuant to §13.1(C) of this Agreement) determines any and all wages, benefits, and working condition issues that may arise from the Employer's proposals and the Union's counter proposals or responses.

*Ibid*.

Section 13.1 of the Hourly CBA, titled "Grievance Process," sets forth the procedures for "handling/disposing of all disputes, misunderstandings, differences, or grievances arising between the Employer and the Union … as to the meaning, interpretation, and application of the provisions of this Agreement." *Id*. at 21. The procedures culminate in "binding arbitration," *ibid*., § 13.1(C), which the parties refer to as "grievance arbitration," Doc. 1 at ¶¶ 9-10; Doc. 29 at 13, although, as just noted, the interest arbitration provision incorporates by reference the arbitration procedures set forth in Section 13.1(C).

## Discussion

"[B]ecause arbitration is a matter of contract, a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Gore v. Alltel Commc'ns, LLC*, 666 F.3d 1027, 1032 (7th Cir. 2012) (internal quotation marks omitted). Accordingly, on a motion to compel arbitration, the court "must first determine whether the [movant] is making a claim that is, 'on its face,' governed by the [agreement's] arbitration clause." *Int'l Bhd. of Elec. Workers Loc. 2150 v. NextEra Energy Point Beach, LLC*, 762 F.3d 592, 594 (7th Cir. 2014) (quoting *United Steelworkers of Am. v. Am. Mfg. Co*., 363 U.S. 564, 568 (1960)).

"[W]hile the arbitrability of a dispute is ordinarily regulated by state law, collective bargaining agreements are interpreted under federal law," though the court "may draw guidance from state law principles if they are compatible with federal labor law policies." *Dexter Axle Co.*

4

*v. Int'l Ass'n of Machinists & Aerospace Workers, Dist. 90, Lodge 1315*, 418 F.3d 762, 765 n.1 (7th Cir. 2005) (internal quotation marks omitted). To determine whether the parties agreed to submit a "particular dispute to arbitration, [the court] must turn to the specific language of the arbitration clause. … [In so doing, the court] look[s] first to the plain meaning of the provision, and strive[s] to avoid absurd results." *Int'l Bhd. of Elec. Workers, Loc. 21 v. Ill. Bell Tel. Co.*, 491 F.3d 685, 688 (7th Cir. 2007). At the same time, the court must remain "mindful that both the law and public policy strongly favor arbitration, and that the party seeking arbitration is entitled to the benefit of the doubt. Where the arbitration clause is broad, [the court] presume[s] arbitrability of disputes. And where any ambiguity as to the scope of the clause exists, [the court] will construe it in favor of the party seeking arbitration." *NextEra*, 762 F.3d at 594 (internal citations omitted). Consequently, if a "grievance, on its face, clearly falls within the scope of [an] arbitration clause," the "dispute will be arbitrable … unless [the court] can say otherwise with 'positive assurance'"—that is, "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Ibid.* (quoting *United Steelworkers of Am. v. Warrior & Gulf*, 363 U.S. 574, 582-83 (1960)).

The Local argues that the Fund's vaccination policy is a "new plan of an economic nature covering wages or other benefits" under Section 5.2(a) of the Hourly CBA, and thus subject to interest arbitration under Section 5.2(b), because it "impacts wages, benefits, and working conditions for the Hourly employees" by awarding PTO to employees receiving a vaccine, by "forcing employees who are not vaccinated to burn through their existing accrued PTO" to avoid being assessed unexcused absences, by requiring employees to be vaccinated in order to work, and by providing for the eventual termination of unvaccinated employees who are assessed too many unexcused absences. Doc. 23 at 10. The Local's argument rests on the premise that "[t]he

phrase 'plan of an economic nature covering wages or other benefits' unambiguously means a plan is economic in nature if it covers those subjects [wages or benefits]." Doc. 32 at 7. The Fund takes the contrary view, contending that the policy does not "qualify as a 'new plan of an economic nature' simply because it may have some attenuated effect on 'wages and other benefits' insofar as there are disciplinary consequences attached to non-compliance," as such a broad interpretation would encompass "virtually all workplace policies." Doc. 29 at 12.

The Local's reading of the phrase "plan of an economic nature covering wages or other benefits" cannot be reconciled with the phrase's plain terms because it effectively excises the clause "of an economic nature." As just noted, the Local argues that "a plan is economic in nature if it covers" wages or other benefits. Doc. 32 at 7. That is, the Local submits that if a plan "cover[s] wages or other benefits," it necessarily is a plan "of an economic nature." The Local's position is incorrect because "cover[s] wages or other benefits" and "of an economic nature" have distinct meanings and impose separate requirements, each of which must be met for a plan to fall under Section 5.2.

The clause "of … (a certain) nature" means "of a (also the) type, character, etc., specified." *Nature*, Oxford English Dictionary (3d ed. 2003) (phr. P1); *see Def. Sec. Co. v. First Mercury Ins. Co.*, 803 F.3d 327, 331-32 (7th Cir. 2015) (using the Oxford English Dictionary to determine the meaning of a contractual term). Here, the type specified is "economic," which in the context of Section 5.2(a) means "of, relating to, or based on the production, distribution, and consumption of goods and services." *Economic*, Merriam-Webster Dictionary Online (def. 1a), https://www.merriam-webster.com/dictionary/economic; *see Aeroground, Inc. v. CenterPoint Properties Tr.*, 738 F.3d 810, 814 (7th Cir. 2013) (using the Merriam-Webster Dictionary Online to determine the meaning of a contractual term); *see also Economic*, The American Heritage

*Dictionary of the English Language* (def. 1a), https://www.ahdictionary.com/word/search.html?q=economic ("Of or relating to the production, development, and management of material wealth, as of a country, household, or business enterprise."). Thus, a plan "of an economic nature" is a plan that relates to or is based on the production of goods or services.

A workplace policy can "cover wages or other benefits" without being "of an economic nature." Consider a policy that forbids employees from wearing jeans to work and imposes a penalty of one lost day of PTO per violation. That policy impacts employees' PTO benefits, but it cannot reasonably be characterized as a policy "of an economic nature" or described as relating to or based on the production of goods or services; rather, it is a workplace rule with a potential downstream impact on wages or other benefits. As this hypothetical illustrates, the inclusion of the clause "of an economic nature" in the phrase "plan of an economic nature covering wages or other benefits" carves out from Section 5.2 policies that may affect wages or benefits but that are unrelated to the production of goods or services. The Local's interpretation of "plan of an economic nature covering wages or other benefits" thus effectively and improperly reads out "of an economic nature" from the provision. *See Harrell v. U.S. Postal Serv.*, 445 F.3d 913, 925 (7th Cir. 2006) (noting that the court "usually tr[ies] to avoid" interpretations that render a CBA provision "superfluous"); *Murphy v. Keystone Steel & Wire Co., a Div. of Keystone Consol. Indus.*, 61 F.3d 560, 566 (7th Cir. 1995) (holding that the court "cannot" interpret a CBA provision such that the provision "would be rendered meaningless or superfluous").

Another ground for rejecting the Local's interpretation of Section 5.2 is that it cannot be squared with Section 13.1. Section 13.1 states: "In order to provide an orderly method of handling/disposing of all disputes, misunderstandings, differences, or grievances arising between

the Employer and the Union … as to the meaning, interpretation, and application of the provisions of this Agreement, such differences shall be settled in the following manner." Doc. 1-2 at 21. The rest of Section 13.1 lays out the grievance process: first, the grievance is addressed to the employee's supervisor; if an accord is not reached, the grievance then goes to the Fund's human resources department; and if that does not resolve the matter, a grievance arbitration is held. *Ibid*. By its plain terms—in particular, its stated purpose to "provide *an* orderly method of handling/disposing of *all* disputes," and its direction that disputes "*shall* be settled" according to the grievance process, *ibid*. (emphases added)—Section 13.1 conveys that the default procedure for resolving disputes arising under the Hourly CBA is the grievance process, which culminates in grievance arbitration.

True enough, Section 5.2 provides for a second kind of arbitration (interest arbitration) in certain defined circumstances (disputes regarding "plan[s] of an economic nature covering wages or other benefits"), and further provides that procedures for interest arbitrations will follow those set forth for grievance arbitrations in Section 13.1(C). But the Local's broad reading of Section 5.2 to encompass all employee policies impacting wages or other benefits would subject virtually every employee policy to both grievance arbitration *and* interest arbitration. After all, it is difficult to imagine an employee policy whose implementation might not have some downstream impact on wages or other benefits, particularly any policy imposing penalties for noncompliance. Because it would subject virtually all employee policies to interest arbitration, the Local's interpretation of a "plan of an economic nature" improperly undermines Section 13.1's function as the default procedure for resolving disputes arising under the Hourly CBA.

There is no need here to set the outer bounds of which policies might qualify as plans "of an economic nature," for the Fund's vaccination policy, which it adopted "[t]o provide and maintain a safe workplace," Doc. 1-2 at 77, § 1.0, plainly is not "of an economic nature." As noted, a plan "of an economic nature" is one relating to or based on the production of goods or services. To be sure, ensuring that all employees are vaccinated could indirectly affect the Fund's ability to provide health, welfare, and pension fund management services—for instance, by making it harder or easier for the Fund to recruit qualified employees, or by reducing anxiety among employees in the office regarding the risk of contracting COVID-19. Still, the policy does not relate to the manner in which the Fund provides services to its members. As such, the policy is not a "plan of an economic nature," and thus is not subject to interest arbitration under Section 5.2(b).

The Local contends that a motion to compel arbitration can be denied only where "there [is] a positive assurance that the arbitration clause is 'not susceptible of an interpretation' that would demand arbitration." Doc. 27 at 2 (quoting *Warrior & Gulf*, 363 U.S. at 582). According to the Local, this principle requires the court to compel interest arbitration because the clause "of an economic nature" is, at the very least, "susceptible of an interpretation that a plan acquires an 'economic nature' when it 'cover[s] wages or other benefits' to any extent." Doc. 32 at 7. The Local's argument misunderstands the "positive assurance" principle. Seventh Circuit precedent holds that the "positive assurance" standard applies only if the court first determines that "the … grievance, on its face, clearly falls within the scope of the [CBA's] arbitration clause." *NextEra*, 762 F.3d at 594; *see id*. at 595 ("[The Union's] grievance is arbitrable on its face. That means we will compel arbitration unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.") (internal quotation

9

marks omitted); *id*. at 598 ("[T]he Union's grievance falls within the scope of the arbitration clause on its face. As a result, we must compel arbitration unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.") (internal quotation marks omitted). Because the Fund's vaccination policy is not "on its face" a "plan of an economic nature" subject to interest arbitration under Section 5.2, the "positive assurance" principle does not apply.

## Conclusion

The Local's motion to compel interest arbitration under the Hourly CBA is denied. The court of course expects that the grievance arbitrations under the Hourly CBA and the Salaried CBA will proceed apace.

October 12, 2021

_____
United States District Judge